**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAMIE TINBERG,<br><br>Plaintiff,<br><br>v.<br><br>AUDIO AND VIDEO LABS, INC.<br>and CD BABY,<br><br>Defendants. | ) | Case No.: 1:26-cv-3078 |

**COMPLAINT**

Plaintiff Jamie Tinberg, through undersigned counsel, and for her Complaint against Defendants Audio and Video Labs, Inc. and CD Baby, alleges as follows:

**NATURE OF THE ACTION**

1. This is a civil action for sex discrimination, sex-based hostile work environment, discriminatory discharge, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Illinois Human Rights Act, 775 ILCS 5/1-101 et seq.

2. For nearly fourteen years, Plaintiff worked successfully for Defendants and developed a strong record of performance, promotions, raises, and increasing technical responsibility.

3. The terms and conditions of Plaintiff's employment changed dramatically after she began reporting to Data Team Manager Brent Benkstein in 2022.

4. Under Benkstein's supervision, Plaintiff was excluded from team dynamics, spoken over, treated in a belittling and demeaning manner, subjected to unequal scrutiny, publicly undermined, and treated materially differently than male coworkers.

5. Plaintiff repeatedly complained internally to management and human resources that she was being treated differently because she was a woman and that the conduct was damaging her professionally and personally.

6. Defendants failed to conduct an appropriate investigation, failed to take effective corrective action, and instead minimized Plaintiff's concerns, discouraged her from formalizing her discrimination complaint, and treated the problem as one for Plaintiff to manage rather than unlawful conduct to correct.

7. After Plaintiff opposed sex discrimination and complained about the hostile work environment, Defendants terminated her employment on March 19, 2025.

8. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered lost wages, lost benefits, loss of future employment opportunities, emotional distress, humiliation, damage to professional reputation, physical manifestations of stress, and other compensatory and equitable harm.

**JURISDICTION AND VENUE**

9. This Court has federal question jurisdiction over Plaintiff's Title VII claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3).

10. This Court has supplemental jurisdiction over Plaintiff's Illinois Human Rights Act claims pursuant to 28 U.S.C. § 1367 because those claims arise from the same nucleus of operative fact as Plaintiff's federal claims.

11. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3) because a substantial part of the events giving rise to these claims occurred in this District, Plaintiff worked remotely for Defendants from Westchester, Illinois,

within this District, and Plaintiff would have continued working in this District but for Defendants' unlawful conduct.

## THE PARTIES

12. Plaintiff Jamie Tinberg is a resident of Westchester, Cook County, Illinois.

13. Since November 2022, Plaintiff performed her work for Defendants remotely from Westchester, Illinois.

14. Defendant Audio and Video Labs, Inc. is a corporation, with its principal offices at or near 9600 NE Cascades Parkway, Suite 180, Portland, Oregon 97220.

15. Defendant CD Baby is a business entity, division, assumed name, brand, and/or employer doing business in interstate commerce, with offices at or near 9600 NE Cascades Parkway, Suite 180, Portland, Oregon 97220.

16. At all relevant times, Defendants employed fifteen or more employees.

17. At all relevant times, Defendants were Plaintiff's employer within the meaning of Title VII and the Illinois Human Rights Act.

18. At all relevant times, Defendants acted through their officers, supervisors, human resources personnel, and agents, including Brent Benkstein, Kelly Jones, Gretchen Boster, and Molly Neuman, all of whom acted within the course and scope of their authority and/or whose conduct was ratified by Defendants.

## ADMINISTRATIVE EXHAUSTION

19. Plaintiff timely filed charges of discrimination with the Equal Employment Opportunity Commission against Audio and Video Labs, Inc. and CD Baby, identified as Charge Nos. 440-2025-12329 and 440-2025-12330, respectively.

20. The EEOC issued Notices of Right to Sue on January 6, 2026 with respect to both charges.

21. This action is being filed within ninety days of Plaintiff's receipt of those Notices of Right to Sue.

22. Plaintiff also exhausted her remedies under the Illinois Human Rights Act through the EEOC and Illinois Department of Human Rights worksharing process.

23. The Illinois Department of Human Rights issued Notices of EEOC Adopted Finding on February 23, 2026 as to IDHR Charge Nos. 2026CR1064 and 2026CR1063, thereby permitting Plaintiff to pursue her civil claims.

24. Plaintiff has satisfied all conditions precedent to the filing of this action.

## FACTUAL ALLEGATIONS

### A. Plaintiff's nearly fourteen-year history of strong performance and advancement

25. Plaintiff worked for Defendants for almost fourteen years.

26. By the end of her employment, Plaintiff held the position of Associate Data Engineer, a role she had held since June 13, 2022.

27. Before Benkstein became her direct manager, Plaintiff had no meaningful history of performance issues during her tenure.

28. Plaintiff consistently received positive performance reviews, raises, and promotions over the course of her employment.

29. In a 2016 performance review, Plaintiff was praised for fully embracing her role, handling a high volume of files in a timely manner, communicating effectively, working well with others, and taking initiative.

30. In a 2018 performance review, Plaintiff was recognized as determined, ambitious, and detail-oriented, and was specifically credited for contributions that were important to the consolidation of more than forty reports into a single report.

31. In a 2021 performance review, Plaintiff was praised for growth in communication and delegation, and her performance was characterized as thriving.

32. These evaluations reflected a longstanding and positive employment record, strong technical growth, and sustained value to Defendants' business.

**B. Benkstein became Plaintiff's manager in 2022, and the discriminatory treatment began**

33. In 2022, Plaintiff began reporting directly to Data Team Manager Brent Benkstein.

34. After Plaintiff came under Benkstein's supervision, she began experiencing exclusion and hostility for the first time in her career with Defendants.

35. In November 2022, Plaintiff emailed Benkstein because she felt left out and not included as part of the team.

36. On or about November 16, 2022, Plaintiff raised that concern with Benkstein during a one-on-one meeting.

37. Benkstein responded dismissively and did not meaningfully address Plaintiff's concern that she was being excluded.

38. At that time, Plaintiff attempted to understand whether the situation reflected the challenges of adjusting to a new manager or whether something more serious was occurring.

39. As the pattern continued, Plaintiff realized that Benkstein's conduct was not isolated and was not simply a normal management transition.

**C. Plaintiff repeatedly complained to Kelly Jones, but the discrimination continued**

40. After the exclusion and hostility began, Plaintiff raised her concerns with Kelly Jones, the Vice President of Data and Analytics.

41. Plaintiff explained that Benkstein's conduct communicated that he did not want her on the team.

42. Plaintiff reported that Benkstein rolled his eyes when she spoke during meetings and acted in ways that made her appear incompetent and unwelcome before colleagues.

43. Plaintiff was concerned that if coworkers and other departments believed her own manager viewed her as unwelcome or incapable, those employees would be less willing to collaborate with her and her reputation inside the company would be damaged.

44. Jones responded in substance that no one on the team was like that.

45. Jones also directed Plaintiff to resources that had previously been kept from her and told Plaintiff to ignore Benkstein's facial expressions and focus on getting through her speaking time during standup meetings.

46. Jones further acknowledged the difficulty of working in technology as a woman.

47. Despite Plaintiff's complaints to Jones, Defendants did not take effective action to stop the conduct.

**D. In 2023, Benkstein's unequal treatment became more pronounced**

48. The mistreatment continued through 2023.

49. On or about January 23, 2023, Plaintiff again reached out to Jones regarding the ongoing issues.

50. Jones indicated she would speak with Benkstein and attempt to resolve the problem, but the conduct continued.

51. Benkstein increasingly interrupted Plaintiff and asserted that he needed to speak first.

52. As Plaintiff continued working under Benkstein, she increasingly observed that he treated male coworkers with greater dignity and respect than he showed her.

53. During Benkstein's first full year-end review of Plaintiff in 2023, he singled out a couple of small mistakes by Plaintiff.

54. Plaintiff's coworkers, who made similar minor mistakes, were not ridiculed for minor mistakes on their own reviews.

55. When Plaintiff discussed her goal of dropping the associate designation from her title, Benkstein responded dismissively and conveyed that the role was something people went to college for, thereby belittling Plaintiff's experience and professional growth.

56. Benkstein also instructed Plaintiff to devote time to learning Dynamic SQL as part of her review goals.

57. After Plaintiff spent time developing that skill, Benkstein later mocked the effort and criticized her for having invested time learning it.

58. Plaintiff nevertheless continued to invest in her own development, including study and practice in T-SQL, SSMS, C sharp, query tuning, and stored procedures during her free time.

59. The pattern of criticism, interruption, moving expectations, and differential respect undermined Plaintiff's confidence and professional standing.

**E. In 2024, the conduct escalated and Plaintiff recognized the treatment as sex-based**

60. By 2024, the mistreatment had worsened and Plaintiff understood that it was directed at her because she was a woman.

61. Plaintiff was the only woman who reported to Benkstein.

62. Coworkers noticed Benkstein's treatment of Plaintiff and validated her concerns.

63. On or about May 31, 2024, during a morning standup, Plaintiff was asked a question and multiple people spoke over her.

64. Jones kept the male team members after the standup to discuss her observation that Plaintiff was frequently interrupted, often by Benkstein.

65. Male coworkers were not interrupted with the same frequency or in the same manner.

66. On or about June 2, 2024, Benkstein's hostility escalated further, including rude responses in team channels, belittling conduct in meetings and one-on-ones, and reprimanding Plaintiff for speaking.

67. Coworkers reached out to Plaintiff to express that they were sorry she was being treated that way.

68. On or about June 3, 2024, a coworker suggested that Plaintiff complain to Human Resources because of the escalating hostility and disparate treatment.

69. Plaintiff was fearful that reporting sex discrimination to Human Resources could result in retaliation and end her career with Defendants.

70. Even so, Plaintiff proceeded to raise discrimination concerns because the hostile treatment based on her gender had become severe, persistent, and intolerable.

71. On or about June 6, 2024, Jones initiated a group Slack communication with the women on the data team and organized meetings to discuss challenges involving communication dynamics, support, mentorship, and frustrations about the way women were treated and perceived on the team.

72. Following that outreach and initial meeting, Plaintiff and other women participated in recurring discussions in which they described exclusion from work and the experience of not being listened to in meetings.

**F. Plaintiff formally complained to Human Resources on September 27, 2024**

73. On or about September 27, 2024, Plaintiff met with Gretchen Boster, Defendants' Senior Vice President of People, and expressly raised sex discrimination concerns.

74. Plaintiff told Boster that she was treated differently than male team members.

75. Plaintiff explained that when she was asked a question, Benkstein would speak over her and answer for her in a stern, dominant, demeaning manner that treated her like a child.

76. Plaintiff explained that Benkstein's conduct made her appear incompetent to other departments, signaled that she was unfit for her role, harmed her internal reputation, and limited opportunities available to her within the company.

77. Plaintiff further reported that one-on-one meetings with Benkstein had become intimidating and hostile and that being alone with him intensified the demeaning nature of his treatment.

78. Plaintiff told Boster that work submitted by Plaintiff was frequently rejected, while the same or similar answers from male team members were accepted.

79. Plaintiff also explained that male team members received grace for mistakes while Plaintiff was demeaned and belittled for minor issues.

80. Plaintiff reported that the ongoing unequal treatment had caused significant stress, eroded her confidence, and damaged her sense of self-worth and professional self-esteem.

81. Plaintiff told Boster that the effects of the treatment extended beyond the workplace and were affecting her life outside work.

82. Plaintiff explained that she often kept her camera off during her morning daily notes and turned it on only after she finished speaking because Benkstein would make faces, laugh, and roll his eyes while she was talking.

83. Rather than initiate an appropriate discrimination investigation and protect Plaintiff from further mistreatment, Boster told Plaintiff to try talking to Jones again.

84. Plaintiff told Boster that she had already been reaching out to Jones for more than a year.

85. Boster nevertheless framed the problem as one associated with being a woman in the workplace and suggested that Plaintiff needed to command respect.

86. Boster also suggested that if colleagues were seeing the behavior, someone else might step in on Plaintiff's behalf.

87. Boster discouraged Plaintiff from filing a formal discrimination complaint.

88. Boster further told Plaintiff to return to Jones because Jones had known Benkstein for a long time and might know how to communicate the issue in a way that would be well received by him.

89. By discouraging a formal complaint and directing Plaintiff to adjust her communication rather than addressing the discriminatory conduct, Defendants failed to take prompt and appropriate remedial action.

**G. Plaintiff again complained to Jones, but Defendants still failed to correct the discrimination**

90. On or about October 2, 2024, Plaintiff again met with Jones to seek help and advice about the ongoing disparate treatment.

91. Plaintiff told Jones that Benkstein's conduct conveyed that he did not want her at the company and that he did not treat the men on the team that way.

92. Plaintiff again reported eye rolling, making faces, speaking over her, and talking to her like a child.

93. Plaintiff explained that the differential treatment caused her to feel diminished in meetings and hesitant to raise even routine questions.

94. Plaintiff emphasized that she deserved to be treated with the same respect as her male coworkers.

95. Even after these renewed complaints, Defendants still failed to stop the conduct.

**H. Plaintiff engaged in protected activity in late 2024 and early 2025, and Defendants retaliated**

96. In late 2024, Plaintiff provided upward feedback through Defendants' review process concerning Benkstein.

97. On or about January 9, 2025, during a one-on-one meeting, Benkstein brought up Plaintiff's upward feedback, expressed displeasure with it, and indicated that he did not agree with it.

98. Plaintiff apologized and explained that she was required to provide the requested feedback as part of the company process.

99. In or about late January 2025, Plaintiff met with Jones to discuss ETL testing resources and broken testing environments, and she also renewed her complaints about Benkstein's treatment.

100. Plaintiff told Jones that she felt emotionally exhausted and defeated and that Benkstein's unequal and undermining treatment had caused significant stress extending into her personal life.

101. Plaintiff also told Jones that Benkstein had expressed frustration about the upward feedback Plaintiff had provided.

102. Jones still did not treat the issue as unlawful discrimination or retaliation.

103. Instead, Jones characterized the matter as a communication issue, suggested active listening by both parties, recommended a communication book, and suggested that Plaintiff use a safe-word type approach in future interactions with Benkstein.

### I. Senior leadership learned more about Plaintiff's situation shortly before the termination

104. On or about January 31, 2025, Plaintiff attended open office hours with CD Baby President Molly Neuman.

105. Neuman indicated that she and Jones had recently discussed Plaintiff's attendance at the open office hours and appeared surprised that Plaintiff was attending again.

106. During that meeting, Plaintiff asked questions about data and technology projects, possible future team collaborations, and possible department changes or mergers.

107. Neuman appeared surprised that Plaintiff's leadership had not already discussed those topics with her.

108. Neuman also appeared surprised to learn that Plaintiff loved her job and the company.

109. Neuman indicated that she planned to follow up with Jones about the lack of information that had been provided to Plaintiff.

### J. Plaintiff's condition worsened, and Defendants terminated her on March 19, 2025

110. On or about February 5, 2025, Plaintiff met with Jones and Benkstein to discuss the concerns she had recently raised to Jones.

111. While Plaintiff was attempting to explain the disparate treatment she was experiencing, she disclosed that her hair was falling out from the stress.

112. Benkstein cut Plaintiff off and prevented her from continuing to discuss that issue.

113. On March 19, 2025, Defendants terminated Plaintiff's employment.

114. Defendants told Plaintiff that her position was being eliminated to make room for a more senior-level data engineer role.

115. That stated reason was inconsistent with Plaintiff's strong performance record, her nearly fourteen years of successful service, the timing of her internal complaints, and the surrounding facts.

116. As a direct and proximate result of Defendants' conduct, Plaintiff lost her employment, wages, benefits, and other compensation.

117. Plaintiff has also suffered loss of future earning capacity, loss of future employment opportunities, and professional reputational harm.

118. Defendants' conduct was intentional, willful, reckless, and in conscious disregard of Plaintiff's federally and state protected rights.

## COUNT I
## TITLE VII SEX DISCRIMINATION AND DISCRIMINATORY DISCHARGE
## Against Both Defendants

119. Plaintiff realleges and incorporates the above paragraphs as though fully set forth herein.

120. Plaintiff is a woman and therefore a member of a protected class under Title VII.

121. Plaintiff was qualified for her position and was performing her job satisfactorily.

122. Plaintiff had a long and successful work history with Defendants, including positive reviews, raises, promotions, and increasing technical responsibilities.

123. Defendants subjected Plaintiff to materially adverse actions because of her sex, including differential treatment in the day-to-day terms and conditions of employment, heightened

scrutiny, belittling treatment, rejection of her work, undermining of her professional credibility, and termination.

124. Male employees on Benkstein's team were treated with greater dignity, greater respect, and greater grace for mistakes than Plaintiff received.

125. Defendants held Plaintiff to different and harsher standards than similarly situated male employees.

126. Defendants terminated Plaintiff on March 19, 2025 because of her sex.

127. Defendants' stated reason for the termination was pretextual.

128. Plaintiff's sex was a motivating factor in Defendants' decision to treat her less favorably and to discharge her.

129. As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff has suffered and will continue to suffer damages.

**COUNT II**
**TITLE VII SEX-BASED HOSTILE WORK ENVIRONMENT**
**Against Both Defendants**

130. Plaintiff realleges and incorporates by reference the above paragraphs as though fully set forth herein.

131. Plaintiff was subjected to unwelcome harassment because of her sex.

132. The harassment included exclusion, interruption, speaking over her, eye rolling, facial expressions intended to demean her, talking to her like a child, rejecting her work while accepting similar work from male employees, belittling her over minor issues, changing expectations, and undermining her before coworkers and other departments.

133. The harassment was severe and/or pervasive.

134. The harassment occurred over an extended period, intensified under Benkstein's supervision, and altered the terms and conditions of Plaintiff's employment.

135. As Plaintiff's direct supervisor, Defendants are vicariously liable for Benkstein's harassment of Plaintiff.

136. The harassment interfered with Plaintiff's work performance, damaged her professional standing, and caused significant emotional and physical harm.

137. Defendants knew or should have known of the hostile work environment because Plaintiff complained repeatedly to Jones and complained to Boster and because coworkers and management observed the conduct.

138. Defendants failed to take prompt and effective remedial action.

139. Because Benkstein was Plaintiff's supervisor and because Defendants failed to correct the conduct after receiving notice, Defendants are liable for the hostile work environment.

140. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer damages.

**COUNT III**
**TITLE VII RETALIATION**
**Against Both Defendants**

141. Plaintiff realleges and incorporates by reference the above paragraphs as though fully set forth herein.

142. Plaintiff engaged in protected activity under Title VII by complaining internally about sex discrimination, disparate treatment, and a hostile work environment to management and human resources.

143. Plaintiff also engaged in protected activity by providing upward feedback concerning Benkstein through Defendants' review process.

144. Defendants knew about Plaintiff's protected activity.

145. After Plaintiff engaged in protected activity, Defendants failed to investigate appropriately, discouraged her from formalizing her discrimination complaint, focused on her communication rather than the discriminatory conduct, expressed displeasure with her upward feedback, continued the hostile treatment, and ultimately terminated her employment.

146. The temporal proximity and sequence of events, together with Defendants' discouragement of formal complaint procedures and post-hoc performance justification, establish a causal connection between Plaintiff's protected activity and the adverse actions taken against her.

147. Defendants terminated Plaintiff and otherwise retaliated against her because she opposed conduct made unlawful by Title VII.

148. As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff has suffered and will continue to suffer damages.

**COUNT IV**
**ILLINOIS HUMAN RIGHTS ACT SEX DISCRIMINATION AND DISCRIMINATORY DISCHARGE**
**Against Both Defendants**

149. Plaintiff realleges and incorporates by reference the above paragraphs as though fully set forth herein.

150. The Illinois Human Rights Act prohibits discrimination in employment because of sex.

151. Defendants treated Plaintiff differently than male employees with respect to the terms, conditions, and privileges of employment.

152. Defendants also terminated Plaintiff because of her sex.

153. Defendants' asserted explanation for Plaintiff's termination was pretextual.

154. Plaintiff's sex was a motivating factor in Defendants' adverse treatment and discharge of Plaintiff.

155. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer damages.

**COUNT V**
**ILLINOIS HUMAN RIGHTS ACT SEX-BASED HOSTILE WORK ENVIRONMENT**
**Against Both Defendants**

156. Plaintiff realleges and incorporates by reference the above paragraphs as though fully set forth herein.

157. The Illinois Human Rights Act prohibits harassment and hostile work environment because of sex.

158. Defendants subjected Plaintiff to unwelcome sex-based harassment that had the purpose or effect of substantially interfering with her work performance and creating an intimidating, hostile, and offensive working environment.

159. The hostile work environment was severe or pervasive and materially altered the terms and conditions of Plaintiff's employment.

160. As Plaintiff's direct supervisor, Defendants are vicariously liable for Benkstein's harassment of Plaintiff.

161. Defendants knew or should have known of the harassment and failed to take reasonable corrective measures.

162. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer damages.

**COUNT VI**
**ILLINOIS HUMAN RIGHTS ACT RETALIATION**
**Against Both Defendants**

163. Plaintiff realleges and incorporates by reference the above paragraphs as though fully set forth herein.

164. Plaintiff opposed practices that she reasonably believed violated the Illinois Human Rights Act.

165. Plaintiff complained internally about sex discrimination, unequal treatment, and hostile work environment.

166. Defendants were aware of Plaintiff's protected activity.

167. Defendants retaliated against Plaintiff by failing to address her complaints appropriately, by continuing and condoning the hostile treatment, and by terminating her employment.

168. Plaintiff's protected activity was a motivating factor in Defendants' retaliatory conduct.

169. As a direct and proximate result of Defendants' unlawful retaliation, Plaintiff has suffered and will continue to suffer damages.

**PRAYER FOR RELIEF**

A. Enter judgment in favor of Plaintiff and against Defendants on all Counts;

B. Declare that Defendants violated Title VII and the Illinois Human Rights Act;

C. Award back pay, lost benefits, and other past compensation in an amount to be determined at trial;

D. Award front pay and other future economic losses in an amount to be determined at trial, or reinstatement if appropriate;

E. Award compensatory damages for emotional distress, humiliation, embarrassment, loss of normal life, and other non-economic harm in an amount to be determined at trial;

F. Award punitive damages to the fullest extent permitted by law on Plaintiff's Title VII claims;

G. Award prejudgment and post-judgment interest as allowed by law;

H. Award reasonable attorneys' fees, costs, and expenses as allowed by law;

I. Award injunctive and equitable relief as the Court deems just and proper; and

J. Award such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands trial by jury on all issues so triable.

Dated: March 19, 2026

Respectfully submitted,

Jamie Tinberg

By: *<u>/s/ Quinton Osborne</u>*
One of her attorneys

Quinton Osborne
Osborne Employment Law LLC
799 Roosevelt Road, Suite 3-201
Glen Ellyn, IL 60137
T: 331-702-1538
F: 331-465-0450
Quinton@OsborneEmploymentLaw.com
Attorney Number 6319417